ATTORNEY FOR PETITIONER:
**BETH H. HENKEL**
LAW OFFICE OF BETH HENKEL LLC
Indianapolis, IN

ATTORNEY FOR RESPONDENT:
**JESSICA R. GASTINEAU**
SPECIAL COUNSEL – TAX LITIGATION
OFFICE OF CORPORATION COUNSEL
Indianapolis, IN

FILED
Dec 03 2019, 1:57 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| SQUARE 74 ASSOCIATES LLC, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 19T-TA-00020 |
| | ) |
| MARION COUNTY ASSESSOR, | ) |
| | ) |
| Respondent. | ) |

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**December 3, 2019**

WENTWORTH, J.

Square 74 Associates LLC has challenged the Indiana Board of Tax Review's final determination that dismissed its petitions for correction of an error for the 2008 through 2011 tax years. Upon review, the Court affirms the Indiana Board's final determination.

## FACTS AND PROCEDURAL HISTORY

During the years at issue, the Department of Metropolitan Development of the Consolidated City of Indianapolis, acting for and on behalf of the Metropolitan Development Commission of Marion County, Indiana in its capacity as the Redevelopment Commission of the City of Indianapolis, Indiana (collectively, the "City of

Indianapolis") owned a 7-story 209,888 square foot public parking garage in downtown Indianapolis. (See, e.g., Cert. Admin. R. at 171, 212-15.) The City of Indianapolis leased a portion of the ground floor, consisting of five separate tenant spaces totaling approximately 31,000 square feet, to Square 74 for the operation of five restaurants. (See Cert. Admin. R. at 171-206, 216-31.)

For purposes of assessing the properties, the parking garage and the tenant spaces were each assigned distinct parcel numbers. (See Cert. Admin. R. at 212-31.) See also 50 IND. ADMIN. CODE 1-3-3 (2008) (requiring assessing officials to create permanent assessment records for purposes of assessing improvements on leased ground).) The Marion County Assessor assessed the tenant spaces as follows: Parcel 1 was assessed at $633,800 ($284,500 for land and $349,300 for improvements) for the 2008 tax year and $626,700 ($284,500 for land and $342,200 for improvements) for the 2009 through 2011 tax years; Parcel 2 was assessed at $536,400 ($0 for land and $536,400 for improvements) for the 2008 through 2009 tax years and $540,000 ($0 for land and $540,000 for improvements) for the 2010 through 2011 tax years; Parcel 3 was assessed at $877,100 ($408,200 for land and $468,900 for improvements) for the 2008 through 2011 tax years; Parcel 4 was assessed at $1,606,400 ($917,900 for land and $688,500 for improvements) for the 2008 through 2011 tax years; and Parcel 5 was assessed at $950,600 ($387,900 for land and $562,700 for improvements) for the 2008 through 2011 tax years. (See Cert. Admin. R. at 2, 9, 16, 23, 30, 37, 44, 51, 58, 65, 72, 79, 86, 93, 100, 107, 114, 121, 128, 135.)

Believing that these assessments contained mathematical errors, among other things, Square 74 filed "Petition[s] for Correction of an Error" ("Form 133s") with the

Marion County Auditor for each of the four years at issue on November 13, 2012. (See, e.g., Cert. Admin. R. at 1-2, 6-7.) On February 26, 2016, after the Form 133s were forwarded to the Marion County Property Tax Assessment Board of Appeals ("PTABOA"), the PTABOA adjusted Square 74's assessments by reducing the assessed value of certain improvements and increasing the assessed value of some of the land. (See, e.g., Cert. Admin. R. at 3, 31, 59, 87, 115.) Specifically, the PTABOA adjusted the assessments as follows: Parcel 1 was reduced to $532,300 ($284,500 for land and $247,800 for improvements) for the 2008 tax year and $528,400 ($284,500 for land and $243,900 for improvements) for the 2009 through 2011 tax years; Parcel 2 was increased to $926,000 ($499,100 for land and $426,900 for improvements) for the 2008 through 2009 tax years and $929,600 ($499,100 for land and $430,500 for improvements) for the 2010 through 2011 tax years; Parcel 3 was reduced to $758,100 ($408,200 for land and $349,900 for improvements) for the 2008 through 2011 tax years; Parcel 4 was reduced to $1,584,500 ($917,900 for land and $666,600 for improvements) for the 2008 through 2011 tax years; and Parcel 5 was reduced to $916,400 ($387,900 for land and $528,500 for improvements) for the 2008 through 2011 tax years. (See Cert. Admin. R. at 3, 10, 17, 24, 31, 38, 45, 52, 59, 66, 73, 80, 87, 94, 101, 108, 115, 122, 129, 136.)

On April 5, 2016, Square 74 filed Form 133s with the Indiana Board, claiming that all its assessments contained mathematical errors due to 1) numerous building components being double-assessed; and 2) the assessment of its leasehold interest in the tenant spaces included the underlying land that was allegedly the responsibility of the

3

owner, the City of Indianapolis, not Square 74.[1]  (See, e.g., Cert. Admin. R. at 1-7.)  The

parties subsequently determined that the Square 74 Form 133s could be consolidated

and resolved by means of summary judgment.  (See Cert. Admin. R. at 160-64.)

On May 15, 2018, Square 74 filed its "Motion for Summary Judgment and

Designation of Evidence in Support of Summary Judgment," arguing that the land

assessments were made against the wrong person and illegal as a matter of law because

the terms of its lease stated that it "has no right, interest, or responsibility as to the land"

beneath the tenant spaces.[2]    (See, e.g., Cert. Admin. R. at 165-70, 234-248.)   In

response, the Assessor filed a "Cross[-]Motion to Dismiss" pursuant to Indiana Trial Rule

12(B)(6).  (See Cert. Admin. R. at 249-56.)  In his Cross-Motion, the Assessor contended

that Square 74's appeals should be dismissed for failure to state a claim upon which relief

could be granted because Square 74 complained of errors that were not objective errors

and therefore could not be corrected under the Form 133 appeals process.  (See Cert.

Admin. R. at 251-54.)

On April 18, 2019, without conducting a hearing, the Indiana Board issued its final

determination that granted the Assessor's Cross-Motion.  (See Cert. Admin. R. at 291-

301.)  In its final determination, the Indiana Board explained that while it

> serious[ly] doubts that leasing ground floor space in a structure
> carries with it no interest in the underlying land, particularly where
> the lease does not plainly say so[, it did not need to resolve that issue
> because b]y statute, the interest being assessed was Square 74's

---

[1]  Square 74 also filed Form 130/131 petitions for review with the Indiana Board.  (See Cert. Admin. R. at 160.)  The Indiana Board, however, has not addressed those appeals because it determined "it would be administratively feasible and efficient to first address and determine" the legal issues presented in the Form 133s.  (See Cert. Admin. R. at 160-61.)

[2]  Square 74's designated evidence included the "Square 74 Master Lease," the "Master Lease Estoppel, Consent and Agreement," and the property record cards for the tenant spaces.  (See, e.g., Cert. Admin. R. at 166-68.)

possessory interest, not the land or improvements themselves or fee ownership in them.

(Cert. Admin. R. at 297-98 ¶¶ 15-16.) Consequently, the Indiana Board determined that Square 74's appeals could not be resolved under the Form 133 appeals process, a process limited to resolving objective errors, because the resolution of the issue depended on the subjective matter of how Square 74's leasehold estate was to be valued. (See Cert. Admin. R. at 295-300 ¶¶ 8-20.)

On May 31, 2019, Square 74 initiated this original tax appeal. The Court took the matter under advisement on October 30, 2019. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Thus, to prevail on appeal, Square 74 must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2019).

## LAW

During the years at issue, a taxpayer could challenge a property tax assessment by filing a Form 133 petition for correction of an error with the county auditor. See IND. CODE § 6-1.1-15-12 (2008) (amended 2009). (See also, e.g., Cert. Admin. R. at 1-2.)

5

The Form 133 administrative appeal procedure could be filed at any point within three years from the date the taxes were first due.  See Pulte Homes of Indiana, LLC v. Hendricks Cty. Assessor, 42 N.E.3d 590, 593 (Ind. Tax Ct. 2015), review denied.  See also Hutcherson v. Ward, 2 N.E.3d 138, 142 (Ind. Tax Ct. 2013) (explaining that as of 2013, the Form 133 administrative appeal procedure was no longer restricted to a three-year time limitation by 50 IAC 4.2-3-12).

The types of errors that were correctable under the Form 133 administrative appeal procedure were expressly enumerated.  See I.C. § 6-1.1-15-12(a).  For example, the administrative appeal procedure could be used to correct the following errors:  (1) an assessment against the wrong person; (2) an error in carrying delinquent taxes forward from one tax duplicate to another; (3) the taxes were illegal as a matter of law; or (4) a mathematical error was made in computing an assessment.  See generally I.C. § 6-1.1-15-12(a)-(d).  These types of errors have been designated as objective errors, not errors that required subjective judgment.  See Pulte Homes, 42 N.E.3d at 593.

## ANALYSIS

On appeal, Square 74 contends that the final determination must be reversed because the Indiana Board erred in concluding that the issue, which simply "asks the Court to determine the leasehold interest to be assessed[,]" required the use of subjective judgment.  (See Pet'r Br. at 14.)  Square 74 maintains that the issue is "wholly objective in nature" because its resolution depends on the plain language of three objective items, i.e., its lease, Indiana Code § 6-1.1-10-37(b), and 50 IAC 1-3-3.  (See Pet'r Br. at 16-22; Pet'r Reply Br. at 2-5.)  Alternatively, Square 74 asks the Court to correct the PTABOA's "retroactive assessments" of Parcel 2, claiming the PTABOA exceeded its authority in

6

reassessing the property. (See Pet'r Reply Br. at 4-5.)

## I. Whether Square 74's leasehold estate includes the land

## A. The Lease

Square 74 maintains that the "Square 74 Master Lease" defines the tenant spaces, real estate taxes, and the lessee's and lessor's responsibilities for maintenance, insurance, and damages, "effectively split[ting the] ownership of the land and the improvements" for, among other things, property tax assessment purposes. (See Pet'r Br. at 8-10, 18-19.) Furthermore, Square 74 claims that the "Master Lease Estoppel, Consent and Agreement" supports its position because it does not expressly state that its leasehold interest includes the land under the tenant spaces. (See Pet'r Br. at 10, 17 (defining a "leasehold interest" "as the right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease" (citations omitted)).) Consequently, Square 74 contends that because the designated evidence establishes that it did not have "any right or interest in the land" underlying the tenant spaces, the land assessments were made against the wrong person and should be removed from its assessment records as a matter of law. (See, e.g., Pet'r Br. at 16, 22.)

To prevail under the Form 133 standard, the Master Lease must explicitly state that Square 74's leasehold interest in the tenant spaces excludes the land. Square 74 relies on the definition of "tenant spaces" in the following provision of the Master Lease:

> [T]hose portions of the first floor of the Square 74 Garage that are depicted and/or described on Exhibit A-1, attached hereto and incorporated herein by reference, consisting of: (a) Houlihans, which contains 6,239 square feet; (b) Hard Times Café, which contains 2,830 square feet; (c) Steak N Shake, which contains 5,095 square feet; (d) Planet Hollywood, which contains 11,747 square feet; and (e) The Mikado, which contains 4,849 square feet; together with rights and non-exclusive easements in and to: (a) the Common

7

Facilities; (b) those portions of the Square 74 Garage depicted and/or described on Exhibit A-2, attached hereto and incorporated herein by reference, for the maintenance, repair, replacement, and cleaning of grease traps; and (c) those portions of the Square 74 Garage depicted and/or described in Exhibit A-3, attached hereto and incorporated herein by reference, for the maintenance, repair, and replacement of electrical, plumbing, mechanical, and other equipment and facilities within or exclusively serving the Leased Premises.

(See, e.g., Pet'r Br. at 8, 18 (citing Cert. Admin. R. at 172).) Exhibits A-1, A-2, and A-3, however, are not attached to the Master Lease and have not been designated as evidence. (See Cert. Admin. R. at 165-233.) Square 74 also relies on the provision regarding real estate taxes:

[Square 74] shall pay and discharge, or cause the [qualified sublessees] to pay and discharge, as when the same become due and payable, all Real Estate Taxes assessed for or with respect to the [tenant spaces], the leasehold interest of [Square 74] in the [tenant spaces], and/or any subleasehold interest in the [tenant spaces]; provided that [Square 74] shall pay all such Real Estate Taxes directly to the appropriate assessing authority. [The] Master Landlord shall pay and discharge, as and when the same become due and payable, all Real Estate Taxes assessed for or with respect to the Square 74 Garage, excluding the Real Estate Taxes assessed for or with respect to the [tenant spaces], the leasehold interest of [Square 74] in the [tenant spaces], and/or any subleasehold interest in the [tenant spaces]; provided that, if any Real Estate Taxes are assessed for, or with respect to, the entire Square 74 Garage during the Term, then: (a) a fair and equitable portion of such Real Estate Taxes shall be allocated to the [tenant spaces]; (b) [Square 74] shall pay to [the] Master Landlord, as additional rent and upon receipt of written demand, the amount of such allocated Real Estate Taxes; and (c) [the] Master Landlord shall pay the amount of Real Estate Taxes assessed for, or with respect to, the entire Square 74 Garage directly to the appropriate assessing official.

(See Pet'r Br. at 9, 19 (citing Cert. Admin. R. at 174).) Additionally, Square 74 cites the maintenance provisions in the Master Lease:

(a)    [Square 74's] Obligations. [Square 74], at its cost and expense and at all times during the Term, shall: (a) operate, keep,

8

and maintain the [tenant spaces] in good and safe condition and repair; and (b) provide any repairs and replacements that may be necessary to operate, keep, and maintain the [tenant spaces] in good and safe condition and repair. The operation and maintenance obligations of [Square 74] shall include, without limitation: (a) the maintenance, repair, and replacement of all exterior doors, doorframes, windows, window frames, exterior signs, awnings, and lighting, interior walls, floors, and ceilings (except to the extent that such interior walls, floors, and ceilings are structural components of the Square 74 Garage), and heating, air conditioning, ventilating, lighting, electrical, plumbing, mechanical, and other equipment and facilities within or exclusively serving the [tenant spaces]; and (b) keeping the sidewalk immediately adjacent to the [tenant spaces] in a clean and sightly condition.

(b) <u>Master Landlord's Obligations</u>. Subject to the provisions of Section 24,[3] [the] Master Landlord shall cause all portions of the Square 74 Garage, other than: (i) the [tenant spaces]; and (ii) the exterior doors, doorframes, windows, window frames, exterior signs, awnings, and lighting, interior walls, floors, and ceilings (except to the extent that such interior walls, floors, and ceilings are structural components of the Square 74 Garage), and heating, air conditioning, ventilating, lighting, electrical, plumbing, mechanical, and other equipment or facilities within or exclusively serving the [tenant spaces]; to be maintained and operated by [the Circle Centre Development Company] or its successor as manager of the Square 74 Garage pursuant to, and as required by, the Parking Management Agreement.

(See Pet'r Br. at 10 (citing Cert. Admin. R. at 175 (footnote added)).) (See also Cert. Admin. R. at 171-72.) Finally, Square 74 points to the insurance and damage provisions contained in the Master Lease:

<u>Casualty Insurance</u>. [Square 74], at its cost and expense, shall maintain in full force and effect throughout the Term fire and extended coverage insurance on the [tenant spaces] for at least 100% of its insurable value on a replacement cost basis, less the replacement cost of the foundation and other structural components that are not commonly covered by policies of fire and extended coverage insurance. Master Landlord, at its cost and expense, shall maintain, or shall cause to be maintained, throughout the Term the fire and extended coverage required to be maintained by it or on its behalf pursuant to the Parking Management Agreement.

---

[3] Section 24 of the Master Lease is a limitation of liability clause. (See Cert. Admin. R. at 184.)

9

> Damage or Destruction.  If, at any time during the Term, there is Casualty Damage, then, subject to the obligation of [the Circle Centre Development Company]  or its successor as manager of the Square 74 Garage pursuant to, and as required by, the Parking Management Agreement, to repair, restore, and replace structural components of the Square 74 Garage, [Square 74], at its expense, promptly shall restore the [tenant spaces] as nearly as possible to its condition prior to such damage or destruction; provided that, if substantial Casualty Damage occurs at any time during the Term, and [Square 74] will not be able, within a period of six months after such Casualty Damage occurs, to restore the [tenant spaces] as required under this Subsection, then [Square 74], at its option, may terminate this Lease upon written notice delivered to [the] Master Landlord within 30 days after the Casualty Damage[.]

(See Pet'r Br. at 10 (citing Cert. Admin. R. at 177-78).)

Contrary to Square 74's claim, none of these Master Lease provisions expressly state that its leasehold interest in the tenant spaces excludes the land.  Indeed, the Master Lease does not directly state 1) that the land is excluded, 2) what constitutes a "structural component" for purposes of the lease; or 3) which structural components are not commonly covered by policies of fire and extended coverage insurance.  (See Cert. Admin. R. at 171-91.)  Although Exhibits A-1, A-2, and A-3 may have shed light on the exact parameters of the tenant spaces, they are not included in the designated evidence. In fact, the certified administrative record indicates that those exhibits might have been omitted from the Master Lease when it was initially recorded.[4]  (See Cert. Admin. R. at 171.)  Furthermore, the Master Lease Estoppel, Consent, and Agreement does not define the scope of Square 74's leasehold interest.  (See Cert. Admin. R. at 192-206.)

When the resolution of an issue under review "is automatically dictated by a simple,

---

[4]  The copy of the Master Lease in the certified administrative record contains a typewritten notation, with what appears to be both typed and handwritten initials, stating "Legal Description Missing At Time of Recording."  (Cert. Admin. R. at 171.)

true or false finding of fact, it is considered objective and properly challenged" under the Form 133 administrative appeal process. Bender v. Indiana State Bd. of Tax Comm'rs, 676 N.E.2d 1113, 1115 (Ind. Tax Ct. 1997). If, however, a simple finding of fact does not dictate the resolution of an issue and discretion plays a role, the issue is considered to be subjective and may not be challenged under the Form 133 appeals process. See id. Here, the issue before the Court, whether Square 74's lease documentation defines its leasehold interest to exclude the land under the tenant spaces, requires subjective judgment for its resolution because neither document expressly states that the land is excluded. Accordingly, the Court finds no basis for reversing the Indiana Board's final determination with respect to this claim.

### B. Indiana Code § 6-1.1-10-37(b) and 50 IAC 1-3-3

During the years at issue, Indiana Code § 6-1.1-10-37(b) provided:

> If real property that is exempt from taxation is leased to another whose property is not exempt and the leasing of the real property does not make it taxable, the leasehold estate and the appurtenances to the leasehold estate shall be assessed and taxed as if they were real property owned by the lessee or his assignee.

IND. CODE § 6-1.1-10-37(b) (2008). For purposes of this statute, real property was defined as, among other things, "land located within this state;" "a building or fixture situated on land located within this state;" or "an estate in land located within this state, or an estate, right, or privilege in mines located on or minerals, including but not limited to oil or gas, located in land, if the estate, right, or privilege is distinct from the ownership of the surface of the land[.]" IND. CODE § 6-1.1-1-15(1)-(2), (4) (2008); see also IND. CODE § 6-1.1-1-1 (2008) (providing that "[t]he definitions and rules of construction contained in this chapter apply throughout this article unless the context clearly requires otherwise"). Regulation

11

50 IAC 1-3-3 restates the definition of real property in Indiana Code § 6-1.1-1-15 verbatim and then provides:

> The above section has been construed to mean that all improvements on leased ground shall be assessed as real estate.
>
> To carry out the provisions of this section all improvements on leased ground shall be assessed in the current real estate reassessment program in the same manner as any other real estate. This will include the preparation of a permanent assessment record, the computation of the assessment using Indiana Real Estate Property Appraisal Manual, the mailing of a notice of the assessment, and all other provisions of existing laws and rules and regulations governing the assessment of real estate. The only exception will be that no land or lot values will be included and the assessments and records should clearly show that they represent "Improvements on Leased Ground."
>
> The value of any such improvements should be listed with other real estate in the Assessor's Book and the Tax Duplicate prepared by the county auditor, but, as stated, should be clearly identified as "Improvements on Leased Ground" so there is no conflict with the real estate and improvements thereon assessed in the name of the owner of the fee simple title. This wording may be entered in the column provided for description of real estate. The value of such improvements shall be entered in the appropriate column provided for that purpose in such records.

50 I.A.C. 1-3-3.

Square 74 contends that the statutes and regulation unambiguously define "the leasehold interest [that is] to be assessed" for purposes of property tax assessments involving non-exempt lessees like itself. (See Pet'r Br. at 21; Pet'r Reply Br. at 10.) Square 74 explains that read together the statutes and regulation exclude land from the leasehold interest: (1) "the real-property interest to be assessed to the non-exempt tenant is the leasehold estate and the appurtenances to the leasehold estate[;]" (2) "'real property' for purposes of a leasehold interest [is] an estate in land located within this state[] . . . if the estate, right, or privilege is distinct from the ownership of the surface

12

land[;]" and (3) "all improvements on leased ground shall be assessed in the same manner as any other real estate except that no land values will be included and the assessments and records should clearly show that they represent 'Improvements on Leased Ground.'" (See Pet'r Br. at 21 (internal quotation marks omitted); Pet'r Reply Br. at 10.)

When, as here, the Court is asked to construe a statute, its primary goal is to determine and implement the intent of the Legislature in enacting that statute. See Hamilton Square Inv., LLC v. Hamilton Cty. Assessor, 60 N.E.3d 313, 317 (Ind. Tax Ct. 2016), review denied. Generally, the best evidence of this intent is found in the plain language of the statute itself. See id. See also Johnson Cty. Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue, 568 N.E.2d 578, 581 (Ind. Tax Ct. 1991) (explaining that non-technical statutory words and phrases shall be understood in their plain, ordinary, and usual sense), aff'd, 585 N.E.2d 1336 (Ind. 1992). Accordingly, meaning must be given to each and every word in a statute because the Court will not presume that the Legislature intended to enact a statutory provision that is superfluous, meaningless, or a nullity. Hamilton Square Inv., 60 N.E.3d at 317. When the language of a statute is clear and unambiguous, the Court may not expand or contract its meaning by reading into it language to correct supposed omissions or defects. Hutcherson, 2 N.E.3d at 142. Moreover, these same rules of statutory construction apply to duly promulgated administrative rules and regulations. See Osolo Twp. Assessor, 789 N.E.2d at 112.

Here, the plain language of Indiana Code § 6-1.1-10-37(b) indicates that when real property that is exempt from property taxation is leased to an entity that is not entitled to

13

a property tax exemption, the leasehold estate is to be assessed and taxed as if the lessee owns the real property. I.C. § 6-1.1-10-37(b). Nothing within the statutory language suggests, however, that the statute was intended to dictate the conditions of the lease creating the leasehold estate. See I.C. § 6-1.1-10-37(b). Indeed, under this statute a leasehold estate is synonymous generally with the term "real property." See I.C. § 6-1.1-10-37(b). Indiana Code § 6-1.1-1-15, in turn, defines what constitutes "real property" for purposes of Indiana Code § 6-1.1-10-37(b) and 50 IAC 1-3-3. See generally I.C. §§ 6-1.1-1-15, -10-37(b); 50 I.A.C. 1-3-3. Accordingly, an assessment for a leasehold estate could reflect the assessed value of one or more of the following: land, a building or fixture situated on the land, an appurtenance to the land, or certain mining rights or mineral interests.[5] See I.C. §§ 6-1.1-1-15(1)-(4), -10-37(b). The statutory language, therefore, fails to mandate the scope of Square 74's leasehold estate subject to property tax assessment.

Finally, the plain language of 50 IAC 1-3-3 provides the procedures for assessing improvements located on leased ground. 50 I.A.C. 1-3-3. Nothing within this regulation's language indicates that the Department of Local Government Finance intended to create

---

[5] In the case of a leasehold estate comprised of an estate, right, or privilege in mining rights or mineral interests, the ownership of the land may be distinct from the leasehold interest and therefore should not include the value of the land. See IND. CODE § 6-1.1-1-15(4) (2008). Therefore, in that context, the assessment of the land is separate from the assessment of the leasehold interest. See Riggs v. Board of Comm'rs of Sullivan Cty., 103 N.E. 1075, 1077 (Ind. 1914) (stating that in Indiana, "mining rights and interests in minerals are the subject of horizontal severance from the surface[] and taxable as real estate") (citation omitted); Board of Comm'rs of Vigo Cty. v. Hale, 156 N.E. 172, 173 (Ind. Ct. App. 1924) (providing that when there is separate ownership of the mining rights, the law requires a separate assessment of the land and the mining rights). Consequently, the language of Indiana Code § 6-1.1-1-15, considered in light of Indiana Code § 6-1.1-10-37(b), does not indicate that all leasehold estates automatically exclude the value of land for purposes of assessment. See Lake Cty. Assessor v. Amoco Sulfur Recovery Corp., 930 N.E.2d 1248, 1254-55 (Ind. Tax Ct. 2010) (providing that "[s]tatutes related to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious result when possible") (citation omitted), review denied.

14

a per se rule that the assessment of leasehold estates excludes the underlying land. See 50 I.A.C. 1-3-3. Contrary to Square 74's claims, therefore, Indiana Code § 6-1.1-1-15, Indiana Code § 6-1.1-10-37(b), and 50 IAC 1-3-3 do not establish that its leasehold interest in the tenant spaces excluded the underlying land during the years at issue as a matter of law. Accordingly, Square 74 has not shown that the Indiana Board erred in dismissing its case for failure to state a claim upon which relief may be granted.

## II. Whether the PTABOA exceeded its authority in reassessing Parcel 2

In the alternative, Square 74 asks the Court to reinstate the original assessments of Parcel 2 for the years at issue contending the PTABOA exceeded its authority in reassessing the property. More specifically, Square 74 claims the PTABOA's "retroactive assessments" were unlawful because they were issued without proper notice and time-barred under Indiana Code § 6-1.1-9-4. (See Pet'r Reply Br. at 4-5.)

It is well-settled that this Court cannot review facts or issues raised for the first time on appeal because neither the Indiana Board's final determination nor the certified administrative record would contain the Indiana Board's written findings regarding them. See, e.g., Scheid v. State Bd. of Tax Comm'rs, 560 N.E.2d 1283, 1284-86 (Ind. Tax Ct. 1990); IND. CODE § 33-26-6-3(b) (2019) (limiting the Court's review to the issues raised by litigants during the Indiana Board proceedings or the issues discussed by the Indiana Board in its final determination). The certified administrative record establishes that Square 74's claim regarding the PTABOA's authority to reassess Parcel 2 was not presented to the Indiana Board during the administrative proceedings. (See Cert. Admin. R. at 165-248, 257-70.) Consequently, the Court finds that Square 74 has waived this claim because it could have, but failed, to present it to the Indiana Board.

15

**CONCLUSION**

For the above-stated reasons, the Court finds no basis for reversing the final determination of the Indiana Board. Accordingly, the Court AFFIRMS the Indiana Board's dismissal of Square 74's Form 133s for failure to state a claim upon which relief may be granted.